CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

OCT 05 2011

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| MICHAEL JAMES KEITZ, | ) | |
| | ) | Civil Action No. 3:11-cv-00061 |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OPINION** |
| v. | ) | |
| | ) | By: Hon. Glen E. Conrad |
| COMMONWEALTH OF VIRGINIA, et al., | ) | Chief United States District Judge |
| | ) | |
| Defendants. | ) | |

The pro se plaintiff, Michael James Keitz, filed this action on September 7, 2011,[1] naming as defendants the Commonwealth of Virginia, the University of Virginia, the University of Virginia Medical Center, and the Rector and Visitors of the University of Virginia. The court granted the plaintiff's contemporaneously filed motion to proceed in forma pauperis, pursuant to 28 U.S.C. § 1915(a)(1). After conducting an initial screening of the complaint, however, the court concludes that it must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

## Factual Background

According to the complaint, the plaintiff responded in late summer 2009 to radio advertisements and applied to participate in a medical study at the University of Virginia's Center for Addiction Research and Education (UVA Care).[2] (Docket No. 2 at 1.) UVA Care accepted the plaintiff's application and instructed the plaintiff that he would stay for nine days in UVA Care during the administration of the study. (Id. at 2.) As part of the study, the plaintiff would ingest three doses of the drug Topiramate and, subsequently, would be injected with

---

[1] It is unclear when exactly the plaintiff filed his complaint. However, as explained below, infra note 7, the court assumes that the complaint was filed on September 7, 2011.

[2] This case arises from the same factual origin that served as the basis for a separate complaint filed by the instant plaintiff. Keitz v. Unnamed Sponsors of Cocaine Research Study, Civil Action No. 3:11-cv-00054, 2011 WL 3879518 (W.D. Va. Sept. 1, 2011).

cocaine to test Topiramate's effect on a drug user's desire for cocaine. (Id.) After ingesting the first dose of Topiramate, the plaintiff experienced severe panic and discomfort, and thereafter refused the remaining doses of the drug. (Id.)

UVA Care discharged the plaintiff nine days later, furnishing the plaintiff with written instructions to report immediately to the emergency room in the event that he experienced "manic like symptoms." (Id.) Several days after his release, the plaintiff suffered a severe panic attack and was transported by ambulance to the emergency room at the University of Virginia Medical Center (UVA ER). (Id.) Upon his arrival to the UVA ER, the plaintiff was taken to the assessment area, where he reported his participation in the Topiramate study. (Id.) The UVA ER staff then directed the plaintiff to linger in the lobby "alone in a panic." (Id.) During his wait in the lobby, the plaintiff "fe[lt] unable to breathe, walk, etc. and [was] traumatized [that] no[]one w[ould] help him seeing as how they caused it via the experiment." (Id.)

After "hours" of waiting, a woman summoned the plaintiff to a window where he spoke with the woman about his wait and his condition. (Id. at 3.) Subsequent to this conversation, the plaintiff was unable to walk back to his seat and collapsed on the floor in front of the window. (Id.) The woman to whom the plaintiff spoke "disdainfully inform[ed] him [that] he 'can't sit [t]here.'" (Id.) While the plaintiff remained collapsed on the floor, a second nurse passed the plaintiff and commented to another person that the plaintiff was "crazy." (Id.) No one provided the plaintiff with any assistance while he was collapsed on the floor near the window. (Id.)

"Finally, after hours elapse[d]," UVA ER staff led the plaintiff to "an isolated area out of gener[]al earshot of the other patients," where the plaintiff remained alone. (Id.) The plaintiff claims that he could have been admitted at this time to the "fully staffed psych unit." (Id.) While the plaintiff waited, his "manic state" led him to believe that his "eye vein" was causing

2

his suffering. (Id.) The plaintiff reported this self-diagnosis, which he describes as "lunacy," to three doctors who arrived in the plaintiff's room and also communicated to them his participation in the drug study. (Id.) These three doctors deserted the plaintiff for another prolonged period before a nurse entered the plaintiff's room, "acting as though they fe[lt] plaintiff [was] just a 'nervous nelly.'" (Id.) This nurse administered one dose of valium and then "sen[t] [the plaintiff] into the night[.]" (Id.) This single dose of valium, the plaintiff alleges, failed to stabilize his reaction to Topiramate and failed to prevent his condition from deteriorating. (Id.) The ensuing four or five days, according to the plaintiff, were "a living hell" of fear and hallucinations. (Id.) During this time period, the plaintiff contacted UVA Care several times, but his communications caused the UVA Care staff to distance themselves from the plaintiff even further. (Id.)

The plaintiff then boarded a bus and travelled to Florida to "'cleanse' himself of 'demons.'" (Id. at 4.) However, before journeying to Florida, the plaintiff received a telephone call from a "very nervous" UVA Care doctor to whom the plaintiff reported his destination. (Id.) UVA Care made no further attempts to contact the plaintiff during his tenure in Florida. (Id.) One month later, the plaintiff elected to leave Florida and travel to New York. (Id. at 4.) Before executing his plans, the plaintiff telephoned the same UVA Care doctor to inquire whether the doctor wished to visit with the plaintiff. (Id.) After the doctor responded in the negative, the plaintiff travelled to New York. (Id.) While in New York, the plaintiff suffered from "grave intermittent panic attacks" and experienced "recollections of odd interrogational aspects of the [UVA Care study] he was in." (Id.) The plaintiff reported these medical issues to UVA Care, which categorized such reactions as commonplace. (Id. at 5.) After suffering from a particularly severe panic attack, the plaintiff committed himself to a New York hospital's emergency room,

3

where he received certain sedatives. (Id.) The plaintiff alleges that he "continues to this day to struggle with panic attacks that were non[]existent prior to his participation in the [UVA Care study]." (Id.)

## Standard of Review

Under 28 U.S.C. § 1915, which governs in forma pauperis proceedings, the court bears a mandatory duty to screen initial filings. Eriline Co. v. Johnson, 440 F.3d 656-57 (4th Cir. 2006). Specifically, "a district court must dismiss an action that the court finds to be frivolous or malicious or that fails to state a claim." Michau v. Charleston Cnty., 434 F.3d 725, 728 (4th Cir. 2006) (citing 28 U.S.C. § 1915(e)(2)(B)).

The standard of review for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) also applies to a dismissal for failure to state a claim under § 1915(e)(2)(B). Newsome v. EEOC, 301 F.3d 227, 231 (5th Cir. 2002). Thus, in reviewing a complaint under this statute, the court must "accept as true all well-pleaded allegations" and construe those allegations in the light most favorable to the plaintiff. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). A complaint need not assert detailed factual allegations, but must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Furthermore, even assuming the factual allegations in the complaint are true, they "must be enough to raise a right to relief above the speculative level." Id.

## Discussion

The plaintiff advances in his complaint two causes of action against the defendants—first, a federal claim for a violation of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd(a)-(b), and, second, a medical negligence claim under Virginia

4

law. In performing its screening function with respect to these claims, the court bifurcates its analysis and considers first the EMTALA claim and then the negligence claim.[3]

EMTALA

Congress enacted EMTALA as an "anti-dumping" statute, the limited purpose of which "is to get patients into the system who might otherwise go untreated and be left without a remedy because traditional medical malpractice law affords no claim for failure to treat." Bryan v. Rectors & Visitors of Univ. of Va., 95 F.3d 349, 351 (4th Cir. 1996). Hence, plaintiffs may not utilize EMTALA as a substitute for state law malpractice actions. Power v. Arlington Hosp. Ass'n, 42 F.3d 851, 856 (4th Cir. 1994); Brooks v. Md. Gen. Hosp., Inc., 996 F.2d 708, 710-13 (4th Cir. 1993). Instead, EMTALA serves a different purpose.

EMTALA imposes on participating hospitals[4] two principal obligations. "First, it requires that when an individual seeks treatment at a hospital's emergency room, 'the hospital must provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition' exists." Vickers v. Nash Gen. Hosp., Inc., 78 F.3d 139, 142 (4th Cir. 1996) (quoting 42 U.S.C. § 1395dd(a)). "Second, if the screening examination reveals the presence of an emergency medical condition, the hospital ordinarily must 'stabilize the medical condition' before transferring or discharging the patient." Id. (quoting 42 U.S.C. § 1395dd(b)(1)).

The goal of EMTALA's screening requirement "is to determine whether a patient with acute or severe symptoms has a life threatening or serious medical condition." Baber v. Hosp.

---

[3] The court notes initially that the plaintiff has named as a defendant the University of Virginia Medical Center (Medical Center). Because the Medical Center is a division of the Rector and Visitors of the University of Virginia, Miller v. Univ. of Va. Med. Ctr., 58 Va. Cir. 240 (Va. Cir. Ct. 2002), the Medical Center is an improper defendant. Johnson v. Univ. of Va. Med. Ctr., Civil No. 3:06cv00061, 2007 WL 137111, at *4 (W.D. Va. Jan. 17, 2007).

[4] A participating hospital is defined as a "hospital that has entered into a provider agreement under section 1395cc of this title." 42 U.S.C. § 1395dd(e)(2).

5

Corp. of Am., 977 F.2d 872, 879 (4th Cir. 1992). To achieve this goal, the statute "requires a hospital to develop a screening procedure designed to identify such critical conditions that exist in symptomatic patients and to apply that screening procedure uniformly to all patients with similar complaints." Id. (footnote omitted); see also id. at 881 ("[W]e hold that a hospital satisfies [EMTALA's screening requirement] if its standard screening procedure is applied uniformly to all patients in similar medical circumstances."). However, although EMTALA obligates hospital emergency room departments to apply uniformly its standard screening procedure, EMTALA is not a medical malpractice statute and, thus, does not guarantee that the screening examination will yield a correct diagnosis. Id. at 879.

If this screening process results in a diagnosis that the patient has an emergency medical condition,[5] EMTALA requires the emergency room personnel to provide such additional examination and treatment as is necessary to stabilize[6] the condition. Vickers, 78 F.3d at 145 (quoting 42 U.S.C. § 1395dd(b)(1)). EMTALA "takes the actual diagnosis as a given, only obligating hospitals to stabilize conditions that they actually detect." Id. (quoting Baber, 977 F.2d at 883). In other words, EMTALA "does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware"—"EMTALA would otherwise become coextensive with malpractice claims for negligent treatment." Id.

---

[5] EMTALA defines an "emergency medical condition" as follows:

> [A] medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part . . . .

42 U.S.C. § 1395dd(e)(1)(A).

[6] EMTALA provides that "to stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A).

Applying this law to the facts in the instant case yields the conclusion that the plaintiff has failed to state a claim for an EMTALA violation.[7] Initially, the plaintiff's EMTALA claim fails because the defendants are immune from suit. Johnson v. Univ. of Va. Med. Ctr., Civil No. 3:06cv00061, 2007 WL 1556555, at *7 (W.D. Va. May 24, 2007) (concluding that the Commonwealth of Virginia and the Rector and Visitors of the University of Virginia, as an arm of the Commonwealth, are immune from EMTALA suits because Congress expressed in EMTALA no unequivocal consent to abrogate Virginia's immunity and because the Commonwealth did not subsequently waive its immunity), aff'd, 260 F. App'x 625 (4th Cir. 2008).

In any event, the plaintiff's EMTALA claim fails for a more substantive reason. As mentioned above, EMTALA's core purpose aims at averting disparate treatment. Vickers, 78 F.3d at 143; Brooks, 996 F.2d at 713; Baber, 977 F.2d at 881-82. The plaintiff alleges that the UVA ER personnel failed to screen him adequately because they failed to muster their "full resources" to evaluate and treat him upon his arrival to the UVA ER. (Docket No. 2 at 5-6.) However, the plaintiff fails to allege that he "received different treatment than other patients perceived to have the same medical condition." Vickers, 78 F.3d at 145. For this reason, the plaintiff fails to state a claim of inappropriate screening under EMTALA. See generally id. (affirming the district court's dismissal of the plaintiff's EMTALA claims for inappropriate screening and failure to stabilize, determining that such claims presented allegations more properly brought in state court as malpractice actions); see also Baber, 977 F.2d at 881

---

[7] The court notes that EMTALA imposes a two-year limitations period in which actions must be brought. 42 U.S.C. § 1395dd(d)(2)(C). The plaintiff alleges in his complaint that the relevant events occurred sometime in "late summer 2009." (Docket No. 2 at 1.) The plaintiff filed his complaint no earlier than September 7, 2011, the date he signed the complaint and may have placed it in the prison mailing system. Conrad v. Akers, Civil Action No. 7:10-cv-00560, 2011 WL 3847017, at *5 (W.D. Va. Aug. 30, 2011) (citing Houston v. Lack, 487 U.S. 266 (1988)). Because it is unclear from the factual assertions in the complaint whether the plaintiff filed this suit within the two-year limitations period, the court will not rely on the statute of limitations in dismissing the plaintiff's EMTALA claim.

7
Case 3:11-cv-00061-GEC   Document 5   Filed 10/05/11   Page 7 of 11   Pageid#: 26

(affirming the district court's grant of summary judgment and concluding that the plaintiff offered no evidence of disparate treatment to support his inappropriate screening claim under EMTALA).

The plaintiff's claim that the defendants violated EMTALA through neglecting to stabilize his condition likewise must fail. The fact that the UVA ER staff might have failed, in actuality, to stabilize his alleged reaction to Topiramate is irrelevant under EMTALA. Instead, the only relevant inquiry under EMTALA's stabilization requirement is whether the UVA ER personnel properly stabilized the condition from which they <u>perceived</u> the plaintiff as suffering. See Vickers, 78 F.3d at 145 ("On its face, [EMTALA's stabilization] provision takes the actual diagnosis as a given, only obligating hospitals to stabilize conditions that they actually detect . . . . [EMTALA] does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware."). Under the facts as alleged by the plaintiff, the screening procedure resulted in the UVA ER staff's perception that the plaintiff was a "nervous nelly." (Docket No. 2 at 3.) To treat this perceived condition, the plaintiff alleges, the UVA ER staff administered one dose of valium. (Id.) Hence, under the facts as alleged in the complaint, the plaintiff's claim for a violation of EMTALA's stabilization requirement fails both because the UVA ER staff did not perceive the plaintiff as suffering from an emergency medical condition, see Baber, 977 F.2d at 883 (concluding that EMTALA's stabilization requirement is not triggered unless a hospital actually determines that a patient suffers from an emergency medical condition as this term is defined by the statute), and because, in any event, the staff provided the plaintiff with valium to stabilize the plaintiff's perceived nervousness. See Vickers, 78 F.3d at 145 (determining that a hospital's diagnosis must be accepted at face value for purposes of an EMTALA analysis and concluding that

8

hospitals may be held liable under EMTALA's stabilization provision only for failing to stabilize conditions of which they are aware).

As discussed above, the correctness of the UVA ER's diagnosis as a result of the screening process is irrelevant for purposes of the alleged EMTALA violations. That is a subject for a state law malpractice claim. See id. at 143 (concluding that the plaintiff's allegations of inappropriate screening and failure to stabilize "ultimately present conventional charges of misdiagnosis" properly brought as claims of malpractice under state law). Hence, for the reasons stated above, the plaintiff has failed to state a claim for EMTALA violations upon which relief may be granted. Accordingly, to the extent that the plaintiff seeks to recover from the defendants based on alleged EMTALA violations, the plaintiff's complaint must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

Medical negligence

As discussed above, the plaintiff also seeks to recover from the defendants under a negligence theory. However, the plaintiff's negligence claim fails based on procedural reasons. Initially, the plaintiff failed to file this action within the one-year limitations period provided by the Virginia Tort Claims Act.[8] Va. Code Ann. § 8.01-195.7 (West 2011).

In any event, even if the plaintiff filed his negligence claim within the limitations period, the claim still could not go forward. In Virginia, the Virginia Medical Malpractice Act (VMMA) requires any party alleging negligent medical care to obtain an expert certification of merit prior to serving process upon the defendant. Va. Code Ann. § 8.01-20.1. The failure to comply with this certification requirement gives rise to grounds for dismissal. Id.; Brembry v. United States,

---

[8] The plaintiff alleges in his complaint that the events giving rise to his negligence claim occurred in "late summer 2009." (Docket No. 2 at 1.) As discussed above, his complaint could have been filed no earlier than September 7, 2011. Supra note 7. Hence, the plaintiff failed to file his negligence claim within the one-year limitations period.

9

No. 7:10-cv-388, 2011 WL 121741, at *7 (W.D. Va. Jan. 13, 2011); Delaney v. Marsh, Civil Action No. 7:08-cv-00465, 2010 WL 1212569, at *3 n.6 (W.D. Va. Mar. 25, 2010). The VMMA authorizes excusal of the certification requirement only where the plaintiff, "in good faith, alleges a medical malpractice action that asserts a theory of liability where expert testimony is unnecessary because the alleged act of negligence clearly lies within the range of the jury's common knowledge and experience." Va. Code Ann. § 8.01-20.1. Virginia courts have observed that instances excusing the certification requirement will be "rare." Beverly Enters.-Va. v. Nichols, 441 S.E.2d 1, 3 (Va. 1994).

Here, the plaintiff's complaint and the attached documents are devoid of any reference to the VMMA and to the expert certification requirement. The court finds improper in this instance the excusal of the certification requirement. Virginia precedent clearly establishes that: "[I]n most instances, expert testimony is required to assist the jury. Expert testimony is ordinarily necessary to establish the appropriate standard of care, a deviation from that standard, and that such deviation was the proximate cause of damages." Id. "Virginia courts have allowed plaintiffs to proceed without experts in medical negligence cases only in situations where a layperson would know the requisite standard of care without assistance." Brembry, 2011 WL 121741, at *8 (citing Beverly Enters.-Va., 441 S.E.2d at 3); see also, e.g., Coston v. Bio-Med. Applications of Va., Inc., 654 S.E.2d 560, 562 (Va. 2008) (determining that expert testimony was unnecessary where the plaintiff alleged that the defendant's employees twice placed her in a defective chair, causing her to fall and strike the ground both times); Dickerson v. Fatehi, 484 S.E.2d 880, 882 (Va. 1997) (explaining that expert testimony was unnecessary where the plaintiff alleged that a physician left a needle in her neck following surgery); Beverly Enters.-Va., 441 S.E.2d at 3 (finding expert testimony unnecessary on the issue whether the defendant's

10

employees were negligent in leaving a tray of food with a patient who was unable to feed herself and who previously had serious choking incidents); <u>Jefferson Hosp., Inc. v. Van Lear</u>, 41 S.E.2d 441, 442-43 (Va. 1947) (determining that expert testimony was unnecessary where the plaintiff alleged that nurses delayed thirty minutes in responding to a call from an elderly, bed-ridden patient who previously had deserted his bed without assistance).

In the case at bar, it is not within the common knowledge and experience of a jury to determine whether the UVA ER personnel satisfied the standard of care in their diagnosis of the plaintiff's condition and in their selection of treatment pursuant to that diagnosis. Indeed, ascertaining the exact standard of care in the situation alleged by the plaintiff is an exercise outside of a jury's ordinary comprehension. Thus, the court finds that this case fails to qualify as one of the rare instances in which to dispense with the VMMA's expert certification requirement. Accordingly, because the plaintiff failed to obtain such a certification, the court concludes that the plaintiff has failed to state a claim on which relief may be granted. The plaintiff's claim for medical negligence therefore must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

## Conclusion

For the foregoing reasons, the court concludes that the plaintiff's claims must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B). The Clerk is directed to send a certified copy of this memorandum opinion and the accompanying order to the plaintiff.

ENTER: This 5th day of OCTOBER, 2011.

*/s/ Glen Conrad*

Chief United States District Judge